Before NEWMAN, CLEVENGER, and DYK, Circuit Judges.
Opinion for the court filed by Circuit Judge DYK. Dissenting, opinion filed by Circuit Judge NEWMAN.
DYK, Circuit Judge.
Reliable Contracting Group, LLC (“Reliable”) appeals from a decision by the Civilian Board of Contract Appeals (“Board”). The Board denied Reliable’s claim for an equitable adjustment of a Department of Veterans Affairs (‘VA”) contract which required the installation of three backup generators for a VA medical center. Reliable contends that the VA improperly rejected the generators on the ground that they were not “new” as required by the contract. Because we hold that the Board erred in its interpretation of the contract, we vacate the Board’s decision and remand for further proceedings.
BACKGROUND
On February 10, 2003, the VA awarded a contract to Echo Construction Company (“Echo”) for the design and construction of electrical improvements at a VA medical center. On March 31, 2003, Echo, the VA, and Reliable entered into a novation agreement, effectively replacing Echo with Reliable.
The contract required that three backup generators be installed. Section 1.47 of the contract, entitled “MATERIAL AND WORKMANSHIP,” required that “[a]ll equipment, material, and articles incorporated into the work covered by this contract shall be new and of the most suitable grade for the purpose intended, unless otherwise specifically provided in this contract.” J.A. 79. That section did not define “new.” Separately, § 1.79 incorporated Federal Acquisition Regulation (“FAR”) 52.211-5 by reference. FAR 52.211-5 contained a separate requirement that supplies called for by the contract be “new, reconditioned, or remanufactured,” and it defined “new” to require that the supplies be “composed of previously unused components.” See 48 C.F.R. § 52.211-5.
*1331 Reliable sub-contracted the procurement of the electrical generators to Fisk Electric Company (“Fisk”), which in turn contracted with DTE Energy Technologies, Inc. (“DTE”) to provide the generators. On June 26 and 27 of 2004, DTE delivered two Cummins Power Generation (“Cum-mins”) generators to the construction site. Upon delivery, the VA’s senior resident engineer, Leonard Romano, inspected the two generators and determined that they were, in his view, not “new.” He wrote to Reliable, stating:
I am concerned that [the two generators that were delivered] are not “new” as required by [§ 1.47(a)]. They show a lot of wear and tear including field burns to enlarge mounting holes. Are they new and will you certify them as such? I cannot pay you for these as planned in this month’s payment without that certification.
J.A. 2.
This letter initiated a flurry of letters between Romano, Reliable, Fisk, and DTE, with Fisk and Reliable initially expressing agreement that the generators did not meet the contract specification. For example, on June 28, Fisk wrote to DTE, stating: “[m]y foreman noted that the units were in ‘BAD CONDITION’ and proceeded to install the units.” J.A. 102. Similarly, on June 29, Reliable wrote to Fisk, stating: “[a]s we discussed with you, the equipment on site is clearly unacceptable by anyone’s standards.... ” J.A. 109. On that same day, Reliable wrote to Romano, stating:
Representatives of Fisk have assured us that they were as surprised as anyone at the condition of the equipment delivered to the site. We have been working closely with Fisk personnel to investigate the matter and per our conversation have directed them to remove the nonconforming generators from the project site. J.A. 303. Both Fisk and Reliable personnel continued to investigate the matter, and Romano continued to assert his belief that the generators were not conforming.
After investigation, Reliable and Fisk came to the conclusion that the generators, which were manufactured in 2000, had been previously purchased by others but never used. Reliable presented this information to Romano on July 9, but Romano nonetheless rejected the generators, asserting that “[p]revious ownership makes them used.” J.A. 6. Subsequently, Fisk obtained different generators, which were accepted by the VA and installed.
On April 3, 2007, Reliable submitted a claim to the VA, alleging that the VA had violated the contract and seeking roughly $1,100,000 for additional costs incurred as a result of the VA’s rejection of the three original génerators. The VA failed to timely respond, so Reliable appealed to the Board. On November 27, 2013, the Board denied Reliable’s claim, finding that the generators were not “new” because they were not capable-of being factory' tested. Reliable appealed to this court.
We have jurisdiction pursuant to 41 U.S.C. § 7107(a)(1)(A).
DISCUSSION
We review questions of law, including interpretations of contracts, de novo. Rockies Express Pipeline LLC v. Salazar, 730 F.3d 1330, 1335-36 (Fed.Cir. 2013). We review factual questions for substantial evidence. Id. at 1335.
The parties’ dispute centers around the contract’s requirement that the generators be “new.” The Board held, and the VA presently argues, that “new” requires that each generator be “capable of being tested at the factory.” J.A. 8. This definition comes from the language of § 1.79, which incorporates FAR 52.211-5’s requirement that the generators’ supplies *1332 “meet contract requirements” to be considered “new,” 48 C.F.R. § 52.211-5, and § 16208, which requires that the generators be capable of factory testing.[1] Because the generators left the factory in 2000, the Board reasoned, they were incapable of being factory tested in 2004 and therefore not “new.” On the other hand, Reliable argues that the contract is clear on its face because § 1.79 provides an express definition of “new”: “new” means comprised of unused parts. According to Reliable, because the generators had never been used, they were “new” even though previously owned and damaged by improper storage. We reject both interpretations.
We reject the VA’s and the Board’s interpretation for two reasons. First, the VA never contemporaneously argued that the generators were non-conforming because they were incapable of being factory tested. Generally, evidence of contemporaneous beliefs about the contract is particularly probative of the meaning of a contract. See Blinderman Constr. Co. v. United States, 695 F.2d 552, 558 (Fed.Cir. 1982) (“It is a familiar principle of contract law that the parties’ contemporaneous construction of an agreement, before it has become the subject of a dispute, is entitled to great weight in its interpretation.”); Max Drill, Inc. v. United States, 427 F.2d 1233, 1240 (Ct.Cl.1970) (en banc) (per curiam) (expressly adopting Commissioner Stone’s view that “[t]he interpretation of a contract by the parties to it before the contract becomes the subject of controversy is deemed by the courts to be of great, if not controlling^] weight”). Second, the contract required that the generators be capable of a “factory test” but did not expressly require testing be done at the factory at the time the generators were manufactured, nor did it require that testing be done at the factory if the government did not request it. Here, the Board found that that the generators were subsequently tested by Cummins factory-certified technicians, and the VA declined to observe the testing. There is no showing the generators were incapable of being tested at the factory if actual testing at the factory had been requested by the government—which it had not in fact requested.
On the other hand, we reject Reliable’s interpretation because it is incomplete. While we agree that generators that had been used would not comply with the contract,[2] we think that the mere fact that the generators were not used does not make them “new.” Reliable, aided by the July 8, 2013, affidavit of Fisk’s Executive Vice President James Muhl, argues that the generators were “new” because they were not used, and in the industry, “generators are not ‘used’ until the generators are commissioned!!, at which point] the manufacturer pushes out the new equipment warranty and the unit is put into ‘service.’” J.A. 234. While Muhl’s affidavit speaks to the industry definition of “used,” he does not provide an industry definition of “new,”[3] and dictionaries do not define *1333 “new” as simply being the opposite of “used.”[4] Reliable relies on § 1.79, which incorporated FAR 52.211-5 and defines “new” to mean “composed of previously unused components.” 48 C.F.R. § 52.211-5(a). But, by its own terms, that definition is expressly limited to FAR 52.211-5 itself.[5]
As noted above, there are two separate “new” requirements, one found in § 1.47 and one found in § 1.79. Section 1.79’s “new” requirement focuses on the quality of the components in the generator—the components must be unused. Section 1.47 sets forth a different requirement. Under § 1.47, the generator itself must be “new.” And, in that section, “new” is undefined. Reading the contract in this manner—that § 1.47 and § 1.79 set forth separate and distinct “new” requirements—is reinforced by the rule of construction disfavoring sur-plusage and redundancy. See Mass. Bay Transp. Auth. v. United States, 129 F.3d 1226, 1231 (Fed.Cir.1997) (“It is a fundamental rule of contract interpretation that the provisions are viewed in the way that gives meaning to all parts of the contract, and that avoids conflict, redundancy, and surplusage among the contract provisions.”). Reliable’s interpretation is incomplete because the “new” requirement under § 1.47 focuses on the generator as a whole, not the component parts. While the parties agree that “new” requires no prior use, there is no justification for treating a generator as new solely because it has not been used.
Because “new,” as used in § 1.47, is not defined by the contract and there is no single plain meaning of the word “new,” it is ambiguous. It is therefore appropriate to look both to the dictionary definitions of “new” and to industry definitions, standards, and practices. See C.A. Acquisition Newco, LLC v. DHL Express (USA), Inc., 696 F.3d 109, 113-14 (Fed.Cir.2012) (noting that the trial court “should also consider any relevant industry practices” when resolving ambiguous terms in a contract and looking to dictionary definitions to resolve ambiguities); Hunt Constr. Grp. v. United States, 281 F.3d 1369, 1373 (Fed. Cir.2002) (industry meaning can be used as an interpretative aid in understanding terms in a contract); see also Nat’l Union Fire Ins. Co. v. Lumbermens Mut. Cas. Co., 385 F.3d 47, 55 (1st Cir.2004) (vacating a district court decision interpreting a contract and remanding for further consideration in light of industry practices).
One possible meaning is the one initially put forth by Romano but subsequently dropped, i.e., that “new” means not previously owned by another. This definition was disputed by Muhl’s affidavit. In it, he described that, “[i]n the electrical contracting and construction business, simply being owned and kept in storage by an intermediary does not make a generator ‘used’.... ” J.A. 238. The record evidence shows that generators are not-uncommonly sold through various intermediaries, and, as here, are still entitled to a manufacturer’s warranty. In such cir *1334 cumstances, an interpretation that “new” requires that the generators not be previously owned is incorrect. Indeed, the VA no longer argues that this is the meaning of “new” in this context.
“New” could require that the generators be recently manufactured. This has some support in the dictionaries. See Black’s Law Dictionary 1204 (10th ed.2014) (“recently come into being <the new car was shipped from the factory this morning>”); Webster’s Third New International Dictionary 1522 (2002) (“having existed or having been made but a short time; having originated or occurred lately”). We do not think that this is what the parties intended' when they required that the generators be “new.” Neither party argues for this meaning, and no evidence was put forth with respect to the average life expectancy of a backup generator, the speed at which generator technology is improving, or the like. Recent manufacture is not a requirement.
“New” could require a fresh condition. Dictionary definitions support this interpretation. See Webster’s Third New International Dictionary 1522 (2002) (defining “new” to mean: “usu[ally] of superior quality;” “[f]reshness;” “[f]resh in this connection applies to what is new and still retaining a first liveliness, energy, virginal quality, and so on”). We think this definition is appropriate for purposes of § 1.47. There is no testimony as to how, in the industry, a generator can be “new” if it has been severely damaged. It defies logic to conclude that the parties intended to treat seriously damaged generators as “new.”
In interpreting “new” to require the generators be “fresh,” we do not mean that the generators were required to be entirely free of cosmetic defects. It is entirely foreseeable that slight, superficial damage might occur during shipment or storage, and there is no evidence put forth by either party that the contract intended to define “new” to exclude damage such as paint scratches or light and easily fixable rusting. See, e.g., Groban v. S.S. Pegu, 381 F.Supp. 883, 887, 890-91 (S.D.N.Y. 1971) (explaining that tractors exposed to heavy tropical rains during shipment, which resulted in surface damage to the tractors, were' still “new”). In our view, “new” requires that the'generators must not be used and also must be free of significant damage, i.e., damage that is not cosmetic.
The record evidence before us is conflicting with respect to the extent of the damage, and there was no express finding by the Board on the issue.
While, as noted above, there are unequivocal admissions by Reliable that the generators were significantly damaged and not in conformity with the contract, these statements are not binding judicial admissions. Although this circuit has had limited opportunities to address the doctrine, it is clear from other circuits that judicial admissions, which “have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact,” are limited to formal admissions made in, for example, a complaint, answer, or pretrial order. See Am. Title Ins. Co. v. Lacelaw Corp., 861 F.2d 224, 226 (9th Cir. 1988) (quoting Dery v. Gen. Motors Corp. (In re Fordson Eng’g Corp.), 25 B.R. 506, 509 (Bankr.E.D.Mich.1982)).
Although not formal judicial admissions and therefore not binding, contemporaneous admissions by Reliable are nonetheless probative evidence that the generators did not comply with the contract. See 3M Co. v. Mohan, 482 Fed.Appx. 574, 579 (Fed. Cir.2012) (citing a party’s apologies to customers for causing confusion as support for the factual finding that the party did cause confusion); Sutton v. Calhoun, 593 F.2d 127, 128 (10th Cir.1979) (affirming the trial court’s submission to the jury of the question of how much probative weight *1335 should be assigned to an admission of mistake by a doctor in a case alleging negligence on the part of the doctor); Becton v. Starbucks Corp., No. 2:05-CV-1143, 2007 WL 2688128, at *3 (S.D.Ohio Sept. 6, 2007) (admitting a contemporaneous statement by a Starbucks manager apologizing for an improperly secured lid because it was probative of whether the lid was properly secured). It is also significant that Reliable was unwilling at the time of delivery to certify that the generators were “new” or to characterize them as new.
On the other hand, Muhl, in his July 9, 2013, affidavit, concluded that the damage to the generators was entirely cosmetic. He asserted that the damage to the generators was superficial, consisting of rust, scraped paint, disconnected hoses, and dust, dirt, and grime. According to him, the damage was easily remedied with a “buff and puff” and did not affect the quality of the generators.
There was thus conflicting evidence as to the extent of the damage. There were admissions that the damage to the generators was substantial, but the affidavit from Muhl asserts it was not. In light of the conflicting evidence and lack of fact-finding by the Board on this issue, we remand for the Board to determine whether the damage to the generators during the four-year period between the original manufacture and the date of delivery to the VA site was significant enough to render the generators not “new.”
Because our interpretation of “new” includes an analysis of the extent of the damage and whether it can be fully and easily cured, there is no need to address Reliable’s economic waste theory, as that doctrine substantially overlaps with whether the generators at issue are “new” under the contract. See Granite Constr. Co. v. United States, 962 F.2d 998, 1007-08 (Fed. Cir.1992) (explaining that rejecting performance of a contract in which the performance is entirely adequate for the purpose of the project is economic waste).
VACATED AND REMANDED
Costs
Costs to neither party.

.Section 16208.1.3(E) provides, in relevant part:
Factory Test: The government shall have the option of witnessing the following tests at the factory....
1. Load Test: Shall include six hours of continuous operation; four hours while the set is delivering 100 percent of the specified KW and two hours while delivering 110 percent of the specified KW....
2. Quick Start Test: Record time required for the engine generator set to develop specified voltage, frequency and KW load from a standstill condition.
J.A. 301-02.

. There is no contention here that the generators were used. The run times demonstrated only that the generators had been tested.

. Muhl’s statement that, "[i]f the unit has not be[en] 'used', then the unit is 'new,' ” was his conclusion with respect to these "particular *1333 generator[s],” not a general statement about industry practice. See J.A. 234.

. If anything, the opposite of "new” tends to be “old,” not "used.” See, e.g., Random House Webster’s Unabridged Dictionary 1293 (2d ed. 1999) ("New, fresh, novel describe something that is not old.”); see also Webster’s Third New International Dictionary 1522 (2002).

. FAR 52.211-5, incorporated by reference into § 1.79, provides in relevant part;
(a) Definitions. As used in this clause—
New means composed of previously unused components, whether manufactured from virgin material, recovered material in the form of raw material, or materials and byproducts generated from, and reused within, an original manufacturing process....
48 C.F.R. § 52.211-5 (emphasis added).