NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**YASMIN SAIGHI,**
*Appellant*

**v.**

**GENERAL SERVICES ADMINISTRATION,**
*Appellee*

---

2015-1859

---

Appeal from the Civilian Board of Contract Appeals in No. 3693, Administrative Judges Jeri Kaylene Somers, Jerome M. Drummond, R. Anthony McCann.

---

Decided: April 12, 2016

---

MITCHELL E. SHAMAS, Shamas Law Office, Tulsa, OK, for appellant.

ALBERT S. IAROSSI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

---

Before WALLACH, BRYSON, and TARANTO, *Circuit Judges.*

PER CURIAM.

Appellant Yasmin Saighi seeks review of the decision of the Civilian Board of Contract Appeals ("CBCA"), granting the United States General Services Administration's ("GSA") motion for summary judgment[1] in *Saighi v. GSA*, No. 3693, 2015 WL 1382046 (CBCA Mar. 25, 2015); *see also* J.A. 1–7.[2] The CBCA denied Ms. Saighi's claim for a refund of the purchase price of a boat Ms. Saighi purchased from GSA in an online auction. J.A. 7. For the reasons articulated below, we affirm the CBCA's decision.

BACKGROUND

I. Facts and Proceedings

A. Terms and Conditions of the Online Auction

In May 2013, GSA conducted an online auction for the sale of the M/V Blankenship ("the Blankenship"), a fire/patrol boat docked at the Kaskaskia Regional Port District ("KRPD") marina in Evansville, Illinois. *See* J.A. 2. GSA's online posting identified the Blankenship as the property to be sold, specified its location, and provided its description. *See* J.A. 32–33. The terms and conditions of the auction stated that the "[c]ondition of [the Blankenship] is not warranted. Deficiencies, when known, have been indicated in the property descriptions. However, absence of any indicated deficiencies does not mean that none exists. Therefore, the bidder should ascertain the

---

[1]    In describing this motion, the CBCA uses the analogous term "summary relief." J.A. 5. Throughout the remainder of this opinion, we use "summary judgment."

[2]    Because the electronic source does not include pagination, we cite the CBCA's decision as it appears in the Joint Appendix.

condition of the item through physical inspection." J.A. 26. GSA also warranted that the Blankenship "will conform to its written description. Features, characteristics, deficiencies, etc. not addressed in the description are excluded from this warranty." J.A. 26. Bidders were cautioned that the Blankenship's description represented the "GSA's best effort to describe the item based on information provided to it by the owning agency[,]" and that "gross omissions regarding the functionality of items, failures to cite major missing parts and/or restrictions with regard to usage may occur." J.A. 26. The terms and conditions of the auction also provided that the "Government does not warrant the merchantability of the property or its purpose." J.A. 26. Prospective bidders were provided with a document detailing the terms and conditions of the auction and were required to assent to them before being allowed to submit a bid on the Blankenship. *See* J.A. 22–30.

In addition to the warnings and disclaimers, the terms and conditions set forth a procedure for winning bidders to challenge GSA on the basis that the property purchased failed to conform to its description, and seek a refund of the purchase price. *See* J.A. 26. The contract states: "[a] request for refund must be substantiated in writing to the Contracting Officer for issues regarding mis-described property, missing property[,] and voluntary defaults within [fifteen] calendar days from the date of payment." J.A. 26.

Prior to the auction, with the help of her husband, Mr. Hassan Mahjoub, Ms. Saighi agreed to physically inspect the Blankenship. *See* J.A. 164. The KRPD marina, via its general manager, Mr. Ed Weilbacher, was listed as the inspection contact. *See* J.A. 32–33. Upon inspection, Ms. Saighi "did not advise GSA as to any problems with the [Blankenship]." *See* J.A. 2. On May 30, 2013, Ms. Saighi was notified that her bid of $30,056 to purchase the

Blankenship was the highest offer and was awarded the contract for the Blankenship. *See* J.A. 4. On June 6, 2013, Ms. Saighi subsequently tendered payment and assumed possession of the Blankenship. *See* J.A. 134.

## B.   Ms. Saighi's Refund Request

On October 27, 2013, Ms. Saighi sent an email to Victoria Knotts, a GSA contracting officer, stating that she was informed by local residents that the Blankenship sank a few years before the sale. *See* J.A. 58. Ms. Saighi claimed that upon discovering this "undisclosed fact by [] GSA[] in the auction's item description," she contacted an engine company, which asserted that both engines of the Blankenship needed to be overhauled at a cost of $96,000. J.A. 58.

By letter dated November 19, 2013, Ms. Knotts responded to Ms. Saighi's email. *See* J.A. 73–75. Ms. Knotts asserted she "contacted [Mr.] Weilbacher . . . and he confirmed the Blankenship was in sound condition and afloat at dock for [two] years prior to th[e] sale." J.A. 73. Ms. Knotts also stated that Mr. Weilbacher "confirmed that all bidders were made aware of the condition and he made no assurances or guarantees that the engine ran." J.A. 73. Finally, Ms. Knotts stated that Ms. Saighi "agreed to the . . . terms and conditions of the sale prior to becoming an active bidder." J.A. 73.

In response, Ms. Saighi reasserted her initial complaint that the Blankenship sank before the auction and claimed that the failure of Mr. Weilbacher to inform GSA about the condition of the Blankenship, even though he possessed knowledge that it sank, resulted in a bid greater than the actual value of the Blankenship. J.A. 76. As a result, Ms. Saighi suggested two options that may be taken by GSA to resolve the issue: 1) "refund [the] full purchase price and money invested by [Ms. Saighi] so far

on the Blankenship," or 2) "refund [fifty] percent of the purchase price." J.A. 76.

On December 11, 2013, Ms. Knotts issued a formal decision denying Ms. Saighi's claim. *See* J.A. 78–80. The decision repeated the terms and conditions of the online auction, asserted that Ms. Saighi's claim was not timely submitted, and refuted Ms. Saighi's contention that the Blankenship was inaccurately described in the sales information. *See* J.A. 80.

## C. CBCA Decision

Following GSA's decision, Ms. Saighi appealed to the CBCA. Similar to her arguments before Ms. Knotts, Ms. Saighi argued that "agents of GSA in possession of the [Blankenship] knew" that it sank and "failed to disclose [this] fact in order to deter from devaluing the [Blankenship]." J.A. 82. However, unlike her claim before Ms. Knotts, Ms. Saighi "allege[d] . . . that the contract is voidable based on agency and joint venture theories." J.A. 5. According to Ms. Saighi, an agency relationship existed between GSA and Illinois Contract Management Services ("CMS"), (i.e., the state agency that placed the Blankenship with KRPD) and CMS "failed to disclose to GSA that the [Blankenship] sank prior to the sale and that both engines had been submerged." J.A. 5.

GSA moved for summary judgment, and Ms. Saighi filed a cross-motion seeking the same relief. *See* J.A. 5. The CBCA granted GSA's motion, finding that no genuine issue of material fact existed because Ms. Saighi alleged a breach of contract before Ms. Knotts, but raised a different claim on appeal to the CBCA (i.e., that the contract with GSA is voidable). *See* J.A. 5–7. The CBCA asserted that there is no basis for it "to decide [Ms. Saighi's] allegations that the contract is voidable based on agency and joint venture theories, because the[] allegations involve different operative facts from those presented to [Ms.

Knotts].” J.A. 7 (citation omitted). Accordingly, the CBCA denied Ms. Saighi's cross-motion seeking a refund for the purchase price of the Blankenship.

Ms. Saighi appeals the CBCA's decision. This court possesses jurisdiction pursuant to 28 U.S.C. § 1295(a)(10) (2012).

## DISCUSSION

### I. Standard of Review and Legal Framework

We review the CBCA's conclusions of law without deference. *Reliable Contracting Grp., LLC v. Dep't of Veterans Affairs*, 779 F.3d 1329, 1331 (Fed. Cir. 2015). This court will uphold the CBCA's factual findings unless those findings are “(A) fraudulent, arbitrary, or capricious; (B) so grossly erroneous as to necessarily imply bad faith; or (C) not supported by substantial evidence.” 41 U.S.C. § 7107(b)(2) (2012).

The decision to grant summary judgment is a legal conclusion, which we review without deference. *See Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1446 (Fed. Cir. 1997). Summary judgment is appropriate when material facts are undisputed, or if, when disputed facts are resolved in favor of the non-movant, judgment in law is nonetheless required in favor of the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679 (Fed. Cir. 1984) (“We determine whether, viewing the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in favor of the non-movant, the moving party was entitled to judgment as a matter of law.”).

“A contract is read in accordance with its express terms and the plain meaning thereof.” *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) (citations omitted). We must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. *Hughes Commc'ns Galaxy, Inc. v. United*

*States*, 998 F.2d 953, 958 (Fed. Cir. 1993). Accordingly, if the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning[.] . . . " *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993) (citation omitted).

## II. The CBCA Properly Granted Summary Judgment to GSA

### A.   Ms. Saighi's Agency/Joint Venture Arguments Are Waived

Ms. Saighi disputes the CBCA's summary judgment determination. In particular, she asserts that "the CBCA erred as a matter of law in failing to sustain [her] cross-motion for summary [judgment]." Saighi Br. 26 (capitalization modified). The crux of Ms. Saighi's appeal rests on showing that the contract with GSA is voidable due to GSA's material omissions (i.e., that the Blankenship sank and GSA knew that its engines had been submerged) about the condition of the Blankenship.[3] *See id.* at 12, 22. Although Ms. Saighi does not present evidence that any member of GSA possessed knowledge of the Blankenship's sinking, via an agency or joint venture theory, she seeks to impute knowledge of KRPD marina's general manager Mr. Weilbacher to GSA. *See id.* at 18 (where Ms. Saighi argues that (1) "[e]ither GSA and CMS were engaged in a joint venture for the sale [of the Blankenship]," (2) "CMS was the principal and GSA act[ed] as its agent," or (3) "GSA [was] . . . the principal and CMS an agent"). Ms. Saighi further asserts that "under each possible business relationship[,] GSA is imputed to have the knowledge of [Mr.] Weilbacher regarding the condition of the [Blankenship]." *Id.*

---

[3]   "[A] Government contract tainted by fraud or wrong-doing is void *ab initio*." *Godley v. United States*, 5 F.3d 1473, 1475 (Fed. Cir. 1993) (citation omitted).

The entirety of Ms. Saighi's contention is predicated on showing that Mr. Weilbacher possessed knowledge of the sinking of the Blankenship, and that his knowledge should be imputed to GSA. *See id*. at 13, 15, 17, 20, 26. However, the CBCA did not address this issue because it determined that it had "no basis . . . to decide [Ms. Saighi's] allegations" because they "involve different operative facts from those presented to [Ms. Knotts]." J.A. 7 (citation omitted). Instead, the CBCA grounded its summary judgment determination on the fact that "[t]he terms and conditions of the auction in which Ms. Saighi purchased the [Blankenship] preclude the relief she seeks." J.A. 6.

We agree with the CBCA's conclusion. Ms. Saighi's claim that the contract was voidable on the basis of an agency or joint venture theory involves different operative facts from those presented to the contracting officer. For example, contrary to Ms. Saighi's assertion, her initial letter to Ms. Knotts did not assert that Mr. "Weilbacher was acting as an agent of CMS [or that] his knowledge [should be] imputed to GSA." Saighi Br. 11. In fact, her only mention of Mr. Weilbacher was in regard to his conduct in helping her inspect the physical condition of the Blankenship. *See* J.A. 58 (stating that "the custodian of the Blankenship[,] Mr. Ed Weilbacher[,] was courteous, hand[ed] out the vessel logbooks in time, and went out of his ordinary duty to extend help"). Moreover, although Ms. Saighi's reply to Ms. Knotts's November 19, 2013 response suggests that Mr. Weilbacher knew that the Blankenship sank, she did not proffer any claim before Ms. Knotts suggesting that his knowledge should be imputed to GSA because he served as its agent, nor does she assert that GSA and CMS engaged in an agency or joint venture relationship. *See* J.A. 76 (asserting that "what [is] at stake . . . is the failure of [] GSA/custodian of the Blankenship to inform GSA about the accurate condition of the Blankenship although the custodian [and] the

long time Kaskaskian port secretary were fully aware of the sunken events").

Accordingly, Ms. Saighi did not present any claims to Ms. Knotts that can reasonably be interpreted to support the claims she now proffers before the CBCA (that Mr. Weilbacher served as an agent for GSA and that GSA and CMS were engaged in an agency or joint venture relationship). Because Ms. Saighi failed to present these arguments before the contracting officer, she has waived them. *See Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005) ("Arguments not made in the court or tribunal whose order is under review are normally considered waived." (citation omitted)). Thus, the only issue before us is whether the CBCA is correct in finding that Ms. Saighi's contract with GSA precludes her claim for a refund of the purchase price of the Blankenship.

### B. The Terms and Conditions of the Contract Preclude Ms. Saighi's Refund Request

Ms. Saighi does not dispute that the plain terms and conditions of the contract foreclose the relief she seeks. The contract explained that the only warranty with regard to the condition of the Blankenship was that it would conform to its written description. *See* J.A. 26 ("Features, characteristics, deficiencies, etc. not addressed in the description are excluded from this warranty."). However, Ms. Saighi does not point to any aspect of the Blankenship's sale description that may be characterized as inaccurate. The Blankenship's description states that it has "twin draft V6-92TA Detroit diesel engines." J.A. 32 (capitalization modified). However, the description makes no statement regarding their functionality. Moreover, the terms and conditions of the contract include a provision titled "Description Warranty [and] Refunds," which expressly "cautions bidders that GSA's written description represents [its] *best effort to describe* the [Blankenship]" based on available information and that

"*gross omissions* regarding the functionality of items, failures to cite major parts and/or restrictions with regards to usage may occur." J.A. 26 (emphases added).

In any event, if, after winning the online auction and taking possession of the property, the winning bidder concluded that the Blankenship had been inaccurately described, the terms and conditions of the contract provided a procedure whereby the winning bidder was required to inform GSA within a specific period of time of the misdescription. Specifically, under the "Claims of Misdescription" provision of the contract, once the property had been moved by the winning bidder, as is the case here,[4] a refund is available only if the successful bidder: 1) "submit[s] a written notice to the Sales Contracting Officer within [fifteen] calendar days from the date of payment email notification (the Purchaser's Receipt)"; 2) "maintain[s] the property in its purchased condition"; and 3) "return[s] [the property] at [his or her] expense to the location designated by the Sales Contracting Officer or any other federal official." J.A. 27.

Ms. Saighi failed to satisfy any of these requirements. *See* J.A. 6. In particular, she tendered payment for the Blankenship on June 6, 2013. *See* J.A. 80. However, her email to Ms. Knotts asserting that the Blankenship was inaccurately described was dated October 27, 2013, five months after the sale closed, *see* J.A. 58. Accordingly, the terms and conditions of the online auction foreclose Ms. Saighi's claim. *See George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987) (asserting that contract language should be given its plain meaning without rewriting or varying terms of the contract).

---

[4]    On June 29, 2013, Ms. Saighi authorized her husband to move the Blankenship on her behalf. *See* J.A. 73.

Because Ms. Saighi did not point to any aspect of the Blankenship's written description that was inaccurately described, nor did she satisfy the procedural requirements of the contract with regard to establishing a claim for misdescription, we affirm the CBCA's summary judgment determination.

CONCLUSION

For the foregoing reasons, the decision of the Civilian Board of Contract Appeals is

**AFFIRMED**

**COSTS**

Each party shall bear its own costs.