ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Professional Management Consulting ) | ASBCA Nos. 61861, 62173 |
| Services, LLC ) | |
| ) | |
| Under Contract Nos. GS-35F-015GA, P.O. ) | |
| WMATA-0000119479 ) | |

APPEARANCE FOR THE APPELLANT:     Eden Brown Gaines, Esq.
                                  Brown Gaines LLC
                                  Washington, DC

APPEARANCE FOR THE AUTHORITY:     Jon B. Crocker, Esq.
                                  Chief Counsel
                                  Washington Metropolitan Area
                                   Transit Authority
                                  Washington, DC

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS

       In September 2017, appellant, Professional Management Consulting Services, LLC (PMCS) submitted an unsolicited contract proposal to respondent, the Washington Metropolitan Area Transit Authority (WMATA).  After some discussions, WMATA issued a Purchase Order (P.O.) containing terms that differed from those in PMCS' offer. PMCS did not sign the WMATA-generated Purchase Order; however, a contract was created by performance.  WMATA issued a conformed contract consisting of its purchase order, a WMATA scope of work, PMCS' General Services Administration (GSA) IT Schedule 70, and PMCS's September 5, 2017 technical and cost proposals.

       The contract required PMCS to develop a Disadvantaged Business Enterprise (DBE) Standard Operating Procedure (SOP) manual, and other tasks, for a total contract price of $509,340.16.  The parties subsequently modified the contract to add additional work that is not at issue in these appeals.  PMCS performed under the contract, receiving payment of its invoices, until the last invoice in the amount of $66,015.16.  WMATA initially offered PMCS a partial payment of the invoice, alleging that PMCS' performance of the contract was deficient.  PMCS rejected WMATA's settlement offer and filed a claim seeking payment of the invoice.  WMATA issued an unsigned contracting officer's final decision (COFD) denying the claim.  PMCS appealed to the Board, and we possess jurisdiction pursuant to the deemed denial of the claim (ASBCA No. 61861).

After PMCS' ASBCA No. 61861 was docketed, WMATA issued a final decision asserting an affirmative claim for return of advanced payments in the amount of $164,425.36.  PMCS appealed from that final decision (ASBCA No. 62173) and the appeals were consolidated.  The Board held a one-day hearing on the consolidated appeals in November 2019.  At the hearing, PMCS asserted that it was performing under a GSA schedule contract, rather than the WMATA-issued task order.  Following the hearing, WMATA filed a motion to dismiss PMCS' appeal (ASBCA No. 61861) for lack of subject matter jurisdiction, asserting that PMCS' argument requires the interpretation of the terms of the GSA schedule agreement, and that a GSA contracting officer possesses exclusive jurisdiction to entertain such an argument.

Due to the unusual circumstances surrounding the creation of the contract, the parties disagree not only regarding the interpretation of the contract, also the terms of the contract itself.  Thus, this opinion first determines what the terms of the contract, in fact, are.  Next, we deny WMATA's motion to dismiss PMCS' appeal, finding that our resolution of these appeals does not require interpretation of PMCS' GSA schedule.  Finally, we address the appeals on the merits, sustain both appeals, and enter judgment in favor of PMCS in the amount of $66,015.16.

FINDINGS OF FACT

*I. Contract Formation*

PMCS is a disadvantaged small business located in Washington, D.C. (ASBCA No. 61861 (61861) R4, tab 1 at WMATA-034, 37-38).  In late August 2017, or thereabout, PMCS' president, Mr. Dwight Franklin, was approached by an acquaintance, Mr. John Gilmore, with a business opportunity to perform work for WMATA (tr. 1/140-41).  Mr. Franklin testified that it was his understanding that Mr. Gilmore had attended high school with WMATA purchasing employee Monique Anderson and also had a previous relationship with Ms. Anderson as well as another WMATA purchasing employee, Ms. Suzette Moore (tr. 1/141).  According to Mr. Franklin, Mr. Gilmore proposed that PMCS retain Mr. Gilmore's company as a subcontractor on the contract with WMATA, in exchange for his bringing the work to PMCS (*id.*).  Under this proposal, Mr. Gilmore would serve as the liaison between PMCS and WMATA (*id.*).  Mr. Gilmore apparently approached PMCS because he was looking to partner with a company that had an existing GSA schedule (tr. 1/21; 61861 R4, tab 1 at WMATA-039).

PMCS, working with Mr. Gilmore's company, prepared a proposal to provide various services, including preparation of a procedures manual to the WMATA DBE program, with Mr. Gilmore largely responsible for the details of the proposal (tr. 1/24, 31).  The proposal, dated September 5, 2017, included a scope of work with a Phase 1 to be performed September 2017 – March 2018, and Phases 2 and 3 for follow-on support that

2

were not delineated in the scope of work (61861 R4, tab 1 at WMATA-042). Within Phase 1, PMCS identified 5 tasks and 3 optional tasks:

- Task 1: Project Management Approach & Methodology (All Tasks)
- Task 2: Business Process Analysis
- Task 3: Standard Operating Procedure Development
- Task 4: Process and Performance Metric Identification
- Task 5: Training Manual Development
- Optional Task 1: Small Business Outreach Strategy
- Optional Task 2: SOP Review Program Manual
- Optional Task 3: Training Strategy Development

(*Id.*)

The proposal further specified deliverables for each task. The deliverables for Task 1 included: (1) a project charter; (2) a project schedule; (3) bi-weekly status reports; and, (4) monthly status reports (61861 R4, tab 1 at WMATA-045). The deliverable for Task 2 was a "Business Process Diagram and Workflow Recommendations" (*id.* at WMATA-052). The deliverables for Task 3 included: (1) a comprehensive list of SOPs and process workflows; (2) development of a standard SOP template; (3) SOPs; and (4) process workflows (*id*. at WMATA-053). For Task 4 the deliverables were: (1) process metrics; and (2) performance metrics (*id.* at WMATA-054). The deliverable for Task 5 was the training manual comprised of the SOPs and process workflows (*id.*).

PMCS' proposal contained the following provision regarding acceptance of deliverables:

> 18. DELIVERABLE ACCEPTANCE CRITERIA
>
> PMCS will deliver all formal products concurrently to the DBE Project Lead (and other technical customers, as appropriate), and the Contracting Officer. Electronic transmission will be the primary delivery mechanism; however, PMCS will provide hard copies as appropriate.
>
> The DBE Project Lead will notify PMCS of deliverable acceptance or provide comments in writing within five (5) business days of receipt of a deliverable. If PMCS does not receive comments, feedback or formal acceptance within this five (5) business day period then the deliverable will be considered approved by WMATA. Upon the DBE Project Lead notification of comments and feedback regarding a deliverable, PMCS will address identified needs for

3

deliverable approval and resubmit the updated deliverable to
the DBE Project Lead within a mutually agreeable timeframe.

(61861 R4, tab 1 at WMATA-058)

Accompanying PMCS' proposal was a separate cost proposal, also dated
September 5, 2017 (61861 R4, tab 1 at WMATA-080-84). The cost proposal priced the
five tasks in Phase 1 of the proposal at $396,090.96 and represented that its costs were in
accordance with its GSA IT Schedule 70 (*id.* at WMATA-083). The cost proposal also
provided that the "period of performance for this effort is 6 months from date of contract
award" (*id.*).

Following discussions between the parties, WMATA responded with a WMATA
Purchase Order containing terms and conditions that differed from those in PMCS'
proposal. The administrative record contains a document purporting to be the conformed
contract, dated September 15, 2017 (61861 R4, tab 1 at WMATA-002). This conformed
Contract No. CQ17013, lists the contents of the contract as including: (1) "Purchase Order
119479 Issued 09/15/2017;" (2) "GSA Contract Number GS35F015GA with Price Schedule
Sheet;" (3) "Scope of Work;" and, (4) "Contractors Proposal" (*id.* at WMATA-003). The
purchase order (*id.* at WMATA-004-08) has a date of September 15, 2017, and a revision
date of December 21, 2017 (*id.* at WMATA-004). A second version of the purchase order,
without the revision, is also in the record (ex. A-1). Neither version of the WMATA
purchase order is signed by PMCS (*id.* at WMATA-004-08; ex. A-1).

Perhaps due to the unusual circumstances surrounding the award of the contract,
the conformed contract was poorly drafted. WMATA's acceptance of an unsolicited
proposal was unusual, with Ms. Sylvia Edwards, WMATA's Director of the Small
Business Programs Office, commenting that it was the first unsolicited proposal she had
seen in 14 years in the WMATA procurement department (tr. 1/257). Relevant to these
appeals, the documents comprising the conformed contract conflict regarding the
timeframe for performance, the deliverables required pursuant to the contract, and the
inspection of deliverables. The lack of consistency regarding contractual terms is best
illustrated by the deadline for performance where three of the four documents contain
different performance periods, and the original and revised purchase orders give
conflicting performance dates, such that there are four different dates provided by three
documents.

The document referenced in the administrative record as the September 15, 2017
WMATA Purchase Order No. WMATA-0000119479, is marked as revision 2 and dated
December 21, 2017. Contract Line Item Number (CLIN) 1-1, in the amount of
$509,340.16 included the DBE manual at issue in these appeals, which comprised
$396,090.96 of the CLIN, and an additional $113,249.20 for staff augmentation, that was
not included in PMCS' original cost proposal but was contained in PMCS' revised cost

4

proposal dated September 12, 2018 (61861 R4, tab 1 at WMATA-004; ASBCA No. 62173 (62173) R4, tab 2 at WMATA-279-80). The staff augmentation portion of the contract is not at issue in these appeals. The revised cost proposal states that "PMCS will perform the following scope of work in addition to the work outlined in the Technical Proposal to support the DBE program" (62173 R4, tab 2 at WMATA-279). On December 21, 2017 the parties agreed to an additional CLIN to perform DBE Certification and general compliance support in the amount of $278,658.95 (61861 R4, tab 1 at WMATA-004; tr. 1/36). Purchase Order revision 2, indicates that CLIN 1-1 (the DBE SOP manual and related tasks) has a performance due date of November 30, 2017 (that is, a date three weeks prior to the date of the modification, for work that was still being performed), and CLIN 2-1 (the DBE certification and compliance support) has a performance due date of September 17, 2018 (*id.*). The purchase order contains a break-out of the costs for the DBE certification and compliance support line item with specified hourly labor rates and hours for different labor categories and amounts for training and travel. The WMATA purchase order specifies a not-to-exceed amount for the line item of $278,658.95. (61861 R4, tab 1 at WMATA-004) Conversely, the purchase order does not specify labor rates, the number of labor hours, or amounts for training or travel for the DBE manual CLIN, and does not specify that the $509,340.16 amount is a not-to-exceed limit, rather than a fixed amount (*id.*). Mr. Franklin testified that PMCS did not provide signed timesheets to the government until the DBE certification and compliance CLIN was added to the contract. Mr. Franklin testified to his understanding that the DBE manual was a firm-fixed-price line item, but that the DBE certification and compliance CLIN was flexibly-priced. (Tr. 1/35-36, 65-66).

As noted above, the staff augmentation line item is not at issue in either of the appeals before us. However, the original purchase order (only one page of which is in the record) contains a due date for CLIN 1-1 of September 17, 2018 (ex. A-1). The original purchase order additionally has a hand-written notation indicating that it is a "Firm fixed price" contract (*id.*); however, neither side elicited any testimony as to who made the handwritten notation or when it was written.

The conformed contract does not specify a contract type. The WMATA Procurement Procedures Manual, Version 7.4, like federal procurement policy, disfavors the use of time and material and labor hour contracts (app. supp. R4, tab 18 at PMCS659, 665-66). The WMATA policy provides that a "firm-fixed price contract shall be used for acquiring commercial products or services . . . when the Contracting Officer can establish fair and reasonable prices" (*id.* at PMCS659). Ms. Anderson testified that WMATA used the GSA schedule as a reference for pricing (tr. 1/296). Conversely, the WMATA procurement manual provides that the use of time and material and labor hour contracts require advance written approval from the Chief Procurement Officer and a determination by the contracting officer that it is not possible to define the scope or duration of work or to estimate the contract costs with any degree of confidence and that no other type of contract would be suitable (app. supp. R4, tab 18 at PMCS666). The

5

record in these appeals does not contain such a determination or contracting officer authorization for either CLIN.

The WMATA purchase order incorporates by reference WMATA's standard purchase order terms and conditions (61861 R4, tab 1 at WMATA-006, tab 8). Relevant to these appeals, the WMATA standard purchase order terms and conditions acceptance clause ¶ 1.a, provides that:

> The Authority shall accept or reject tendered supplies as promptly as practicable after delivery, unless otherwise provided in this Contract. The Authority's failure to inspect and/or accept or reject the supplies shall not relieve the Contractor from responsibility for, nor impose liability upon, the Authority for nonconforming supplies.

(61861 R4, tab 8 at WMATA-238) The terms and conditions additionally contain an inspection of services clause at ¶ 26.b, providing:

> If any of the services performed do not conform to Contract requirements, the Authority may require the Contractor to perform the services again in conformity with Contract requirements, without additional cost. When the defects in performance cannot reasonably be corrected by such further performance, the Authority may:
>
> > i. Direct the Contractor to take necessary action to ensure that future performance conforms to contract requirements; and/or
> >
> > ii. Reduce the contract price to reflect the reduced value of the services performed.

(61861 R4, tab 8 at WMATA-253) The WMATA terms and conditions additionally provide that a contractor is in default if it breaches a material obligation of the contract (*id.* at WMATA-265). In the event of a material breach, the contracting officer can send a notice of breach to the contractor, stating that the contractor has 10 days, or such additional time specified by the contracting officer, to cure the breach (*id.*).

6

Both the original and the revised purchase orders state that "his [sic] purchase order is written in accordance with the terms and conditions of GSA contract GS35F01GA" (61861 R4, tab 1 at WMATA-004; ex. A-1[1]). The GSA schedule (61861 R4, tab 1 at WMATA-014-25) provides at ¶ 3.b that "[a]ll task orders are subject to the terms and conditions of the contract. In the event of conflict between a task order and the contract, the contract will take precedence" (*id.* at WMATA-017). The GSA schedule, at ¶ 6, additionally incorporates Federal Acquisition Regulation (FAR) 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAR 2009) (ALTERNATE I – OCT 2008) (DEVIATION 1 – FEB 2007) for firm-fixed-price orders and FAR 52.212-4 for time and materials and labor hour contracts[2] (*id.* at WMATA-019). The FAR deviation applicable to firm-fixed-price orders provides in relevant part:

> (a) Inspection/Acceptance.
>
> . . .
>
> (3) Unless otherwise specified in the contract, the ordering activity will accept or reject services and materials at the place of delivery as promptly as practicable after delivery, and they will be presumed accepted 60 days after the date of delivery, unless accepted earlier.
>
> (4) At any time during contract performance, but not later than 6 months (or such other time as may be specified in the contract) after acceptance of the services or materials last delivered under this contract, the ordering activity may require the Contractor to replace or correct services or materials that at time of delivery failed to meet contract requirements.

FAR 52.212-4, (MAR 2009) (ALTERNATE 1 – OCT 2008) (DEVIATION 1 – FEB 2007). The standard FAR provision applicable pursuant to the GSA schedule to time and materials and labor hour contracts provides:

---

[1] Ex. A-1 lists the GSA contract number as "GS35f015A" rather than "GS35F01GA."

[2] The copy of the PMCS' GSA IT Schedule 70 contained in the record has illegible overprinted text in ¶ 6 "Inspection of Services" following the specification of FAR 52.212-4 for time and materials and labor hour contracts, that may indicate an alternate version of the FAR clause. In supplemental briefing, neither party could identify the specific FAR provision contained in the schedule as applicable to time and materials and labor hour contracts (app. supp. br. at 2-3; WMATA supp. br. at 3-4).

(a) Inspection/Acceptance. The Contractor shall only tender for acceptance those items that conform to the requirements of this contract. The Government reserves the right to inspect or test any supplies or services that have been tendered for acceptance. The Government may require repair or replacement of nonconforming supplies or reperformance of nonconforming services at no increase in contract price. If repair/replacement or reperformance will not correct the defects or is not possible, the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services. The Government must exercise its postacceptance rights (1) [w]ithin a reasonable time after the defect was discovered or should have been discovered; and (2) [b]efore any substantial change occurs in the condition of the item, unless the change is due to the defect in the item.

FAR 52.212-4(a).

The WMATA scope of work, which is captioned as a task order (61861 R4, tab 1 at WMATA-027–33) does not specify the type of contract, but clearly contemplates a labor hour contract. For example, the statement of work provides that:

The offeror shall complete Appendix A - Personnel and Price Proposal and include the proposed labor categories and approved rates on the resumes submitted for the above requested resources. For each resource submitted, the Offeror shall indicate the number of hours per week the resource is available for the performance period and the dates the resource is available to onboard and begin onsite work at WMATA

(*Id.* at WMATA-030-31) The WMATA scope of work additionally provides that the period of performance will "commence immediately after award through June 2018" (*id.* at WMATA-031).

The scope of work also defines the deliverables for the contract. The task order list of deliverables differs from the list of deliverables contained in PMCS' proposal.

1. DELIVERABLES

1.1 Basis of Acceptance of Deliverables

8

The engagement deliverables will be discussed at the start of the engagement and will likely include, but is not limit [sic] to:

• Participation in meetings and discussions of DBE goals;
• On-site visits to process DBE applications;
• Contract compliance;
• On-site visits to work site to ensure DBE compliance;
• Periodic reporting and updates to DBE management;
• Completed forms and reports as required by the program; and
• Complete evaluations and assessments with appropriate opinions and conclusions.

1.2. Standard Deliverables
All deliverables shall be provided in either Microsoft Word, Excel, PowerPoint or Visio, unless otherwise agreed upon.

Status deliverables for this contract include:

• Bi-weekly Resource/Timesheet Reports . . .
• Bi-weekly General and Cumulative Performance . . .
• Bi-weekly Status Report

(61861 R4, tab 1 at WMATA-028-29) The scope of work has lines for a company representative to sign and date the document, but the copy in the record is unsigned (*id.* at WMATA-033). At the hearing, Mr. Franklin testified he had not previously seen the WMATA scope of work, but that it was generally consistent with his understanding of the scope of work for the project (tr. 1/33-34).

## II. Contract Performance

Following contract award, PCMS held a kick-off meeting with WMATA (tr. 1/44). WMATA was represented primarily by Franklin Jones, chief of WMATA's Department of Fair Practices (*id.*). At the meeting the parties discussed the deliverables under the contract, with Mr. Jones emphasizing performance of the SOP manual (tr. 1/47-49). According to Mr. Franklin, these discussions defined the scope of work for the contact (tr. 1/43-45). Mr. Franklin testified that Mr. Jones instructed PMCS to perform tasks 1, 2, 3, and 5 of PMCS' proposal, but that Mr. Jones was not interested in focusing on task 4 (Process and Performance Metric Identification) (tr. 1/49). Mr. Franklin additionally testified that the parties agreed that the SOP project would be completed within 6 months, or by March 15, 2018 (tr. 1/154, 156, 169).

9

At this time, PMCS dealt primarily with WMATA's Department of Fair Practices, and had little if any contact with Management, Audit, Risk and Controls (MARC), a division within WMATA's purchasing department (tr. 1/53-54). In October 2017, Ms. Sylvia Edwards, WMATA's subject matter expert on DBE, began participating in the project (tr. 1/54-56). Ms. Edwards made changes to the contract deliverables, including changing the template for the SOP manual (tr. 1/56-57). Mr. Franklin testified that Mr. Gilmore was concerned that PMCS would take him out of the contract (tr. 1/141). According to Mr. Franklin, Contracting Officer Monique Anderson threatened PMCS not to "take John Gilmore off the project because there wouldn't be a project without him on it" during a meeting in November 2017 (tr. 1/142).[3]

In January 2018, WMATA transferred control of the project from the Fair Practices Division to the Procurement Division (tr. 1/66-67, 123). With the change in oversight, PMCS was to work with Ms. Suzette Moore, WMATA's counsel office, and the MARC office (tr. 1/77-78). PMCS contends that the different stakeholders demanded conflicting changes and provided conflicting feedback (tr. 1/71, 78-79, 101-02, 110-14). Mr. Franklin testified that, at several points, WMATA demanded successive changes that required PMCS to add information that it had previously been instructed to remove or to remove information it had previously been instructed to add (tr. 1/208-10). During performance of the contract, PMCS submitted monthly status reports to WMATA (app. supp. R4, tabs 26-29). PMCS also submitted vouchers for payment and was paid by WMATA.

PMCS submitted a draft of the SOP manual to WMATA on February 14, 2018 (app. supp. R4, tab 10), at a time when Ms. Edwards, the primary WMATA subject matter expert was on vacation (tr. 1/78, 256). The other stakeholders provided comments to PMCS regarding the draft and PMCS incorporated the proposed changes (tr. 1/92-93). This was an iterative process with WMATA reviewing and commenting on the revisions (tr. 1/101-02, 128). Mr. Sheffield, of the MARC office, sent an email to several of the stakeholders indicating his approval of PMCS' work and complimenting the quality of the draft (ex. A-2).

The parties dispute whether PMCS provided the deliverables required by the contract. Mr. Franklin was questioned regarding the deliverables enumerated in PMCS' technical proposal. He testified that PMCS provided the agenda, draft project charter, and meeting minutes that were deliverables for the project kick-off meeting (tr. 1/150; 61861 R4, tab 1 at WMATA-043). The deliverables, as defined in PMCS' technical

---

[3] Neither party questioned Ms. Anderson about this statement during the hearing. WMATA asserts that the relationship between PMCS and WMATA had "soured" and that PMCS continued on the project, apparently without Mr. Gilmore, despite its "lack of DBE expertise" (WMATA reply br. at 2). Mr. Franklin alluded to the existence of "issues" with Mr. Gilmore (tr. 1/141).

proposal for Task 1, included: (1) a project charter; and (2) a project schedule (61861 R4, tab 1 at WMATA-045). Mr. Franklin testified that PMCS prepared a project charter, but was unable to identify the document in the record, and could not recall whether a copy of the charter was produced in discovery (tr. 1/160). Mr. Franklin also testified that the project schedule was provided as part of the monthly status report (tr. 1/161). Task 1 also required biweekly and monthly status reports, and Mr. Franklin testified that they were provided (tr. 1/161-62).

Task 2 of the statement of work required a business process diagram and workflow recommendations (61861 R4, tab 1 at WMATA-052). Mr. Franklin testified that this deliverable was satisfied by the SOP manual (tr. 1/162). According to Mr. Franklin, "part of [the SOP manual] is the business process diagram and the work flow" (tr. 1/163).

Mr. Franklin similarly testified that the deliverables for Task 3 ((1) a comprehensive list of SOPs and process workflows; (2) developing a standard SOP template; (3) SOPs; and (4) process workflows (61861 R4, tab 1 at WMATA-053)) were all contained in the SOP manual (tr. 1/164). Task 4 required process and performance metrics as deliverables (*id.* at WMATA-054), and Mr. Franklin testified that these were contained in the monthly reports (tr. 1/164-65). Finally, Mr. Franklin testified that the training manual that was the deliverable for Task 5, was incorporated into the SOP manual (tr. 1/165).

During performance of the project, PMCS regularly invoiced WMATA. Despite the fact that the WMATA statement of work contemplated a labor hour type contract, in performance, the parties treated the DBE manual as a firm-fixed-price CLIN. The invoices for CLIN 1-1, the DBE manual, and staff augmentation, do not contain a labor hour breakdown and simply list a quantity of "1" for consulting services in the amount of $66,015.16 or a similar amount[4] (app. supp. R4, tabs 33-36, 39-40). Some of the invoices provide detailed breakouts of activities during the period, but without labor hours or labor rates being specified (*e.g*., 62173 R4, tab 3 at WMATA-282-85). The invoice amount was based on the invoicing schedule contained in PMCS' cost proposal and divided the $396,090.96 line item cost estimate into six equal payments of $66,015.16 (61861 R4, tab 1 at WMATA-083). By contrast, the vouchers that included work for CLIN 2-1, DBE certification and compliance support, included variable quantities of labor hours that were invoiced at specific labor hour rates (app. supp. R4, tabs 37, 41-42).

---

[4] Invoices # 677 and # 696 were actually in the amount of $61,319.88 (app. supp. R4, tabs 33, 35). Invoice # 688 was in the amount of $122,639.76 (double $61,319.88) (app. supp. R4, tab 34).

*III.  PMCS' Submission of the DBE SOP Manual*

On February 8, 2018, in response to a status update, Ms. Moore questioned PMCS regarding "slippage" in the project schedule (app. supp. R4, tab 12 at PMCS551). Mr. Franklin responded that the project schedule had slipped due to the addition of more stakeholders to the review process, the receipt of additional documentation, changes to the final document delivery, and modification of the scope of the SOPs, and he indicated that there would be no additional charge for the slippage (*id.* at PMCS550).  Ms. Moore indicated that an extension of the performance deadline was unacceptable, and requested performance by March 14, 2018 (*id.* at PMCS548).  Mr. Franklin indicated that PMCS would do what needed to be done to meet the March 14, 2018 deadline (*id.*).  By email dated March 8, 2018, Mr. Franklin informed WMATA that the project would not be completed by March 14, 2018, and requested a meeting to discuss the project (app. supp. R4, tab 11 at PMCS544).  Mr. Franklin indicated that he wanted to discuss the project scope, schedule, and the cost impact for completing the remaining work (*id.* at PMCS542).  Ms. Moore reminded Mr. Franklin of his previous statement that there would be no additional charge for additional slippage, and indicated that there had been no change in scope of the project (*id.* at PMCS540-41).  Mr. Franklin responded, on March 9, 2018, that PMCS intended to provide the SOP deliverables by March 19, 2018 and provided a detailed explanation of outstanding issues and options for addressing the issues (*id.* at PMCS537-39).  Ms. Moore responded on March 13, 2018 (four days later, and the day before the asserted March 14, 2018 deadline), by providing guidance on the issues but did not respond to PMCS' proposal to deliver the SOP manual by March 19, 2018 (*id.* at PMCS536).  Mr. Franklin interpreted Ms. Moore's response as agreeing to an extension of time until March 19, 2018 (tr. 1/100).  PMCS delivered the SOP manual by email at 12:40 am on March 17, 2018 (app. supp. R4, tab 24).

*IV.  WMATA's Review of the DBE SOP Manual*

Upon receipt of PMCS' SOP manual, Ms. Edwards reviewed the document with two attorneys from the WMATA Office of General Counsel (tr. 1/218).  They spent 6 weeks reviewing the SOP manual, reviewing 12 or so pages per day (*id.*).  Their review uncovered hundreds of errors, including items that they considered to be critical errors (61861 R4, tab 2; tr. 1/218-23).  For example, the draft SOP submitted by PMCS referenced the Freedom of Information Act (FOIA) (61861 R4, tab 2 at WMATA-113); however, WMATA is not a federal government entity and is not subject to FOIA (tr 1/183, 221).  Instead, for WMATA purposes, the correct reference would be to the Public Access to Records Policy (PARP), a term with which Mr. Franklin was unfamiliar at the hearing (tr. 1/182, 221).

During this review process, WMATA never communicated with PMCS to have PMCS revise or correct its SOP manual.  Mr. Franklin testified that he didn't know of any WMATA concerns until "around" July 2018 (tr. 1/188).  On June 21, 2018, over

three months after PMCS' submission, Ms. Anderson emailed a copy of WMATA's comments on the SOP manual in track changes format, with a comment that PMCS should "review and [WMATA] will contact you next week to further discuss" (app. supp. R4, tab 15). At a meeting in July 2018, PMCS offered to make the changes requested in WMATA's comments, but Ms. Anderson indicated that the issues had already been resolved (tr. 1/107, 110).

## V. The Parties' Negotiations Regarding PMCS' Final Invoice

PMCS submitted its invoice # 728, in the amount of $66,015.16, to WMATA for payment on March 20, 2018 (61861 R4, tab 3). WMATA paid PMCS' prior invoices late or behind schedule (tr. 1/62). On May 16, 2018, PMCS received a notification from WMATA that its invoice had been approved and was "awaiting payment" (app. supp. R4, tab 14). At the July 2018 meeting mentioned above, Ms. Anderson proposed to pay PMCS $45,000, rather than the invoice amount of $66,015.16 (tr. 1/110, 129-30). Internal WMATA emails produced during discovery demonstrate that Ms. Moore, the chief procurement officer, had indicated that she was "willing to pay some portion for the labor, but as I said, the product is poor. I do not want to pay the entire invoice" (app. supp. R4, tab 21 at PMCS996). Mr. Franklin rejected Ms. Anderson's offer of $45,000 on behalf of PMCS (tr. 1/110-12).

## VI. PMCS' Appeal

As this appeal involves a contract with WMATA, which is not a federal government agency, the Contract Disputes Act (CDA) 41 U.S.C. §§ 7101-09, does not apply to these appeals. Instead, WMATA's Standard Non-Federal Purchase Order Terms and Conditions (61861 R4, tab 8)[5] provides the disputes clause relevant to this appeal. The disputes clause provides:

> Any dispute concerning a question of fact arising under or related to this Contract that is not disposed of by agreement, shall be decided by the Contracting Officer, who shall reduce his/her decision to writing and provide a copy to the Contractor. The Contracting Officer's decision shall be final and conclusive unless, within thirty (30) calendar days from

---

[5] We note that the WMATA purchase order references the standard non-federal purchase order terms and conditions hosted on the WMATA webpage (61861 R4, tab 1 at WMATA-006). The terms and conditions on the WMATA webpage contain a different disputes clause providing a right of appeal to the federal district courts in Washington, DC, Maryland and Virginia, rather than to this Board. We rely upon the terms and conditions submitted to the record of this appeal by WMATA and without objection from PMCS.

13

the date of its receipt, the Contractor provides the Contracting Officer with a written notice of appeal addressed to the Authority's Board of Directors. . . . The Armed Services Board of Contract Appeals (ASBCA) is the Board of Director's [sic] authorized representative for final decisions on appeal.

(61861 R4, tab 8 at WMATA-245)

Also relevant to these appeals is the FAR disputes provision for schedule contracts, which provides in relevant part:

8.406–6 Disputes.

(a) *Disputes pertaining to the performance of orders under a schedule contract.* (1) Under the Disputes clause of the schedule contract, the ordering activity contracting officer may—

(i) Issue final decisions on disputes arising from performance of the order (but see paragraph (b) of this section); or
(ii) Refer the dispute to the schedule contracting officer.

(2) The ordering activity contracting officer shall notify the schedule contracting officer promptly of any final decision.

(b) *Disputes pertaining to the terms and conditions of schedule contracts.* The ordering activity contracting officer shall refer all disputes that relate to the contract terms and conditions to the schedule contracting officer for resolution under the Disputes clause of the contract and notify the schedule contractor of the referral.

(c) *Appeals.* Contractors may appeal final decisions to either the Board of Contract Appeals servicing the agency that issued the final decision or the U.S. Court of Federal Claims.

FAR 8.406-6. This FAR provision is also reflected in the WMATA Procurement Procedures Manual, Version 7.4, which provides that disputes pertaining to the performance of orders under a schedule contract can be decided by WMATA contracting

officers, or the contracting officer may refer the dispute to the GSA contracting officer (app. supp. R4, tab 18 at PMCS775).

By letter dated July 24, 2018, PMCS sent a letter to WMATA requesting a written decision from the contracting officer regarding the unpaid invoice (61861 R4, tab 7). The record contains an unsigned letter[6] from WMATA dated August 3, 2018, denying PMCS' request for payment (app. supp. R4, tab 9 at PMCS470-71). The unsigned final decision states that WMATA denied payment of the invoice because PMCS provided an "unusable work product" and failed to meet the professional standards contained in the project because the final document "(1) omitted procedures critical to establishing a compliant DBE program; (2) included procedures that were incomplete or incorrect; and (3) contained numerous typos and other grammatical errors" (*id.* at PMCS470). The unsigned final decision includes a notice of appeal rights to this Board (*id.* at PMCS471). PMCS filed a notice of appeal and complaint, dated October 31, 2018 (app. supp. R4, tab 17).

PMCS' appeal was docketed as ASBCA No. 61861. PMCS' complaint sought payment of invoice # 728 in the amount of $66,015.16, plus Prompt Payment Act interest, and attorney fees and costs under the Equal Access to Justice Act, and requested to participate in the Board's Small Claims (Expedited) procedure pursuant to Board Rule 12.1(a). By Order dated November 7, 2018, the Board advised the parties that WMATA appeals are governed by the Board's rules effective September 1, 1973, and the 1973 rules do not provide for expedited review, but that the Board would consider PMCS' request if WMATA consented to the procedure (Bd. Order Nov. 7, 2018). WMATA, in fact, objected to the expedited review and by Order dated November 29, 2018, the Board denied PMCS' request to proceed under Board Rule 12.1(a) due to the objection (Bd. Order Nov. 29, 2018).

*VII. WMATA's Affirmative Claim*

Following PMCS' appeal to the Board, WMATA issued a COFD, dated June 7, 2019, demanding repayment of $164,425.36, the amount paid to PMCS for work that WMATA contends was defective or missing (62173 R4, tab 1 at WMATA-271-72). In the final decision, Ms. Anderson found that PMCS had invoiced WMATA in a total amount of $711,125.65, and that WMATA had paid $556,333.51 (*id.* at WMATA-272). In addition to PMCS' invoice # 728 in the amount of $66,015.16 at issue in PMCS' appeal, WMATA also found that it had denied PMCS' invoice # 733 in the amount of $44,739.28 and invoice # 735 in the amount of $44,037.70 (*id.*). Mr. Franklin testified on behalf of PMCS that invoices 733 and 735 were, in fact, paid by WMATA (tr. 1/306). Ms. Anderson found that PMCS had provided the personnel and consulting services

_____

[6] WMATA states that the unsigned final decision was issued to PMCS (WMATA supp. br. at 5).

under the staff augmentation portion of CLIN 1-1 and the DBE certification and compliance support required by CLIN 2-1 (62173 R4, tab 1 at WMATA-272-73). However, Ms. Anderson found that the work described in the original technical proposal (the SOP manual) and priced at $396,090.96 was "delivered late, in poor condition, or not at all" (*id.* at WMATA-273).

In her final decision, Ms. Anderson found that PMCS had defaulted on the contract by failing to complete the work during the period of performance, eliminating WMATA's obligation to pay (*id.*). Ms. Anderson additionally found that the deliverables listed in the statement of work were only partially delivered, and that the work submitted was in "draft" rather than final format and was unusable (*id.*).

At the hearing, Ms. Anderson testified that she based her final decision on the deliverables contained in PMCS' technical proposal and that the deliverables listed in the WMATA scope of work were completely unrelated to the technical proposal deliverables (tr. 1/299-300). Ms. Anderson was generally unable to identify the deliverables that she contended had not been provided by PMCS under the contract (tr. 1/270-98). She testified that she had relied upon the review performed by the Contracting Officer's Technical Representative (COTR), Ms. Edwards, and others, to assemble the information used as a basis for her final decision (tr. 1/300).

Ms. Edwards, the COTR and DBE expert, did not attend the kick-off meeting where Mr. Franklin contends the scope of the project was changed (tr. 1/230). Ms. Edwards additionally testified that she had not seen the statement of work for the project or PMCS' technical proposal (tr. 1/230-31). Ms. Edwards testified that she did not need to read the scope of work because she had a discussion with PMCS defining and outlining what WMATA needed (tr. 1/232). Additionally, Ms. Edwards indicated that she compared PMCS' work to the requirements of 49 C.F.R. Part 26, setting the requirements for a DBE program because "[y]ou have to have a desk book that follows the parameters of that" (tr. 1/233). PMCS timely appealed the June 7, 2019 COFD.

DECISION

As a first step, we decide WMATA's motion to dismiss by determining the proper construction of the conformed contract. After resolving the jurisdictional question, we turn to the merits of the appeals.

*I. WMATA's Motion To Dismiss*

      *A. Standard of Review*

PMCS bears the burden of proving the Board's subject matter jurisdiction by a preponderance of the evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d

16

746, 748 (Fed. Cir. 1988); *United Healthcare Partners, Inc.*, ASBCA No. 58123, 13 BCA ¶ 35,277 at 173,156 (citing *Cedars-Sinai Med. Center v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993)).

### B. WMATA's Motion to Dismiss is Denied

At the hearing, counsel engaged in the following colloquy:

> MR. CROCKER [WMATA counsel]: Objection, Your Honor. Once again, the GSA contract terms and conditions were supplied by the appellant. They are incorporated into the conformed contract. They are not the contract.
> MS. BROWN GAINES [counsel for PMCS]: My question was just that . . . it's a task order under the GSA contract. I didn't ask about this, whether this was the contract.
> MR. CROCKER: It if [sic] were true that this was a GSA contract, the Board would be denied jurisdiction with this case.
> MS. BROWN GAINES: Well then, we have a problem. Because it's a GSA contract. And I don't know if the Board is deprived of jurisdiction. Maybe you have jurisdiction over it. But this is unequivocally a GSA contract. They produced the GSA contract.

(Tr. 1/289; *see also* tr. 1/6, 252) Based on these statements by PMCS' counsel, WMATA filed a motion to dismiss ASBCA No. 61861 for lack of subject matter jurisdiction.

WMATA argues that "[w]hen resolution [of] a contract dispute requires interpretation of the terms and conditions of a GSA schedule contract, it must be presented to the GSA schedule contracting officer for resolution" (WMATA mot. at 3) (citing FAR 8.406-6(b) and quoting *Sharp Elec. Corp. v. McHugh*, 707 F.3d 1367 (Fed. Cir. 2013)). Thus, according to WMATA, the Board is without jurisdiction to entertain ASBCA No. 61861, because the claim seeks, at least in part, an interpretation of the GSA schedule payment provisions (WMATA mot. at 4). PMCS opposes the motion, arguing that the issue is the performance of a delivery order, and not the terms of the GSA schedule, and that the WMATA contracting officer issued a final decision and, thus, vested jurisdiction in the Board[7] (app. opp'n at 1-2).

In order to resolve WMATA's jurisdictional motion, we first interpret the conformed contract to determine whether resolution of PMCS' appeal requires the

---

[7] We note that an invalid COFD cannot create jurisdiction in this Board. *See, e.g., United Partition Sys., Inc.*, ASBCA Nos. 53915, 53916, 03-2 BCA ¶ 32,264 at 159,597.

interpretation of PMCS' GSA IT Schedule 70. As WMATA notes, the FAR provides that either an "ordering activity" contracting officer (here a WMATA contracting officer) or a schedule contracting officer (here a GSA contracting officer) may issue a final decision resolving disputes "arising from performance of the order" issued pursuant to a schedule contract. FAR 8.406-6(a)(1). However, the FAR provides that an ordering agency contracting officer must refer to a schedule contracting officer "all disputes that relate to the contract terms and conditions." FAR 8.406-6(b). Additionally, the Court of Appeals for the Federal Circuit has interpreted FAR 8.406-6 as requiring the schedule contracting officer to resolve mixed disputes requiring interpretation of the schedule terms and conditions as well as performance issues. *Sharp Elec.*, 707 F.3d at 1373. However, the Federal Circuit clarified that not every dispute involving a schedule contract was required to be decided by the schedule contracting officer. The court noted that an ordering activity contracting officer could "apply the relevant provisions of the schedule contract, as long as their meaning is undisputed." *Id.* at 1374. The court additionally noted that an ordering activity contracting officer resolving a performance dispute as to whether goods were conforming could apply the schedule contract's provisions regarding nonconforming goods, but would not need to refer the dispute to the schedule contracting officer unless it required an interpretation of the schedule contract terms and conditions. *Id.*

With this guidance in mind, we hold that the resolution of ASBCA No. 61861 does not require the interpretation of the terms and conditions of the GSA IT Schedule 70, and deny WMATA's motion to dismiss. These appeals do not involve a bilaterally signed contract. Instead, the conformed contract consists of (1) the WMATA purchase order; (2) PMCS' GSA IT Schedule 70; (3) WMATA's scope of work; and (4) PMCS' proposal including the September 5, 2017 cost proposal (61861 R4, tab 1 at WMATA-003). In addition, the WMATA purchase order incorporates by reference WMATA's standard non-federal contract terms and conditions (*id*. at WMATA-006; tab 8). While the GSA IT schedule contains a provision stating that the schedule should be interpreted as having precedence over a conflicting task order (61861 R4, tab 1 at WMATA-017), the remainder of the conformed contract does not contain an order of precedence provision.[8]

PMCS asserts that it has a GSA IT Schedule contract with WMATA (app. resp. at 2, tr. 1/6, 289). WMATA, conversely contends that the GSA IT Schedule comprised part of PMCS' offer, and that some of the terms of the offer were incorporated into the conformed contract, but that the WMATA purchase order, incorporating WMATA's terms and conditions, is the controlling document (WMATA br. at 3). To the extent PMCS is alleging that there is a GSA contract, WMATA contends that the Board lacks

---

[8] The GSA IT Schedule 70 incorporates versions of FAR 52.212-4 (61861 R4, tab 1 at WMATA-019), which contain an order of precedence provision; however, that FAR provision does not resolve the question before us.

jurisdiction (WMATA mot. at 3-4). We find that the WMATA purchase order is the basis for the agreement between the parties.

Interpretation of the conformed contract presents what is often referred to as a "battle of the forms." Contract formation is typically subject to the mirror image rule, and an acceptance containing additional or different terms is treated as a rejection of the offer and as a counter-offer. *See, e.g., First Commerce Corp. v. United States*, 335 F.3d 1373, 1381 (Fed. Cir. 2003). This is also referred to as the "last shot" rule. Here, PMCS made an offer to WMATA, consisting of its GSA schedule, and its cost and technical proposals. Following negotiations, WMATA responded with its purchase order and scope of work. The WMATA purchase order was not a mirror image of PMCS' proposal. Rather, the purchase order contained numerous terms that differed from PMCS' offer. Thus, the WMATA purchase order did not constitute an acceptance of PMCS' offer, but was instead a counter-offer. PMCS did not sign the WMATA purchase order, so it did not formally accept the terms of the WMATA purchase order. However, PMCS accepted the terms of the WMATA purchase order through performance of the contract. Thus, we hold that PMCS is not appealing from a GSA contract, and we deny WMATA's motion to dismiss.[9]

*II. PMCS' Appeal* (*ASBCA No.* 61861)

PMCS seeks payment of its invoice # 728, in the amount of $66,015.16. PMCS contends that it timely provided WMATA the final deliverable, and that WMATA accepted the deliverable, but refused to pay the invoice (app. br. at 10-12). PMCS' argument is premised upon a scope of work that was orally modified at the kick-off meeting, and WMATA's acceptance of the work, based on the 5-day acceptance provision contained in its technical proposal, or alternatively the 60-day acceptance provision contained in its GSA supply schedule for fixed-price contracts. According to PMCS, WMATA's contractual remedy, pursuant to the fixed-price contract provisions of the GSA schedule, was to require PMCS to correct the errors in its work. While PMCS contends that it performed all the work required under the contract, it does not dispute that there were errors in the SOP manual that it delivered to WMATA. PMCS contends that it was willing to correct the errors, but that WMATA did not offer it an opportunity to make revisions (app. br. at 9).

_____

[9] We note that PMCS appealed to the Board outside the 30-day appeal period specified in the WMATA disputes clause (61861 R4, tab 8 at WMATA-245). WMATA has not moved to dismiss on that basis. Our precedent holds that an unsigned COFD, as is the case here (app. supp. R4, tab 9 at PMCS470-71), is not final and does not start the appeal period. *See, e.g., E-Sys., Inc.*, ASBCA No. 32033, 87-1 BCA ¶ 19,417 at 98,181; *J.J. Bonavire Co.*, ASBCA No. 32733, 87-2 BCA ¶ 19,908 at 100,715. Accordingly, we possesses jurisdiction pursuant to a deemed denial of PMCS' claim. *Cf.* 41. U.S.C. § 7103(f)(5).

WMATA contends that PMCS did not fulfil the requirements of the contract, based upon the statement of work contained in PMCS' technical proposal, and the WMATA standard terms and conditions, or alternatively the GSA Schedule acceptance provisions for labor hour contracts (WMATA br. at 8-11).

As explained above, we find that the WMATA purchase order was a counter-offer that PMCS accepted by performance. However, the WMATA purchase order is, itself, ambiguous because it incorporates two conflicting sets of terms and conditions. The purchase order states that it is "written in accordance with the terms and conditions of GSA contract GS35F01GA" (61861 R4, tab 1 at WMATA-004), and WMATA admits that the purchase order "incorporated by reference the terms and conditions of the GSA Contract GS35F01GA" (WMATA br. at 3; 61861 R4, tab 1 at WMATA-006). Pursuant to the WMATA terms and conditions, WMATA had a right of inspection, and could order PMCS to correct deficient work, or could "[r]educe the contract price to reflect the reduced value of the services performed" (61861 R4, tab 8 at WMATA-253). But, the GSA schedule contains two additional acceptance provisions, depending on whether the contract is a fixed-price contract, or a labor hour contract (*id.* at WMATA-019). In order to determine whether the WMATA terms conflict with the GSA terms, we first must determine whether the contract was a firm-fixed-price contract or a labor hour contract.

A labor hour contract is a type of time-and-materials contract where the parties agree to fixed hourly rates for labor categories with payment based on hours incurred. *See, e.g., Dawkins General Contractors & Supply, Inc*., ASBCA No. 48535, 03-2 BCA ¶ 32,305 at 159,845. For firm-fixed-price contracts, FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAR 2009) (ALTERNATE I – OCT 2008) (DEVIATION 1 – FEB 2007) provides that services "will be presumed accepted 60 days after the date of delivery, unless accepted earlier" (FAR 52.212-4(a)(3) (Deviation 1 – FEB 2007)). However, for labor hour contracts, the GSA schedule applies the standard FAR clause that provides that the government must exercise its post-acceptance rights "within a reasonable time" and that that the government may "seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services." FAR 52.212-4(a)

As noted above, the contract does not specify whether it is a fixed-price or a labor hour contract, and the contract contains some provisions consistent with a labor hour contract and other provisions consistent with a fixed-price contract. We find that the DBE SOP manual was a firm-fixed-price CLIN. While the WMATA scope of work appears to have been written in contemplation of a labor hour contract and requests that offerors specify hourly labor rates (61861 R4, tab 1 at WMATA-004, 27-33), none of this information is contained in the WMATA purchase order. The WMATA purchase order contained in the administrative record does not specify hourly labor rates, numbers of hours, or indicate that the CLIN amount is a not to exceed amount for the DBE SOP

20

manual (61861 R4, tab 1 at WMATA-004). Conversely, the WMATA purchase order does contain hourly labor rates, numbers of hours and does specify that the line item amount is a not to exceed amount for the DBE certification and compliance CLIN (*id.*). This is consistent with Mr. Franklin's testimony that PMCS did not submit signed timesheets to WMATA until the flexibly-priced certification and compliance line item was added to the contract (tr. 1/35-36, 65-66). Moreover, we note that the WMATA Procurement Procedures Manual, Version 7.4, like federal procurement policy, disfavors the use of time and material and labor hour contracts (app. supp. R4, tab 18 at PMCS659, 665-66). The WMATA policy provides that a "firm-fixed-price contract shall be used for acquiring commercial products or services . . . when the Contracting Officer can establish fair and reasonable prices" (app. supp. R4, tab 18 at PMCS659). Ms. Anderson testified that WMATA used the GSA schedule as a reference for pricing (tr. 1/296). Conversely, the WMATA procurement manual provides that the use of time and material and labor hour contracts requires advance written approval from the Chief Procurement Officer and a determination by the contracting officer that it is not possible to define the scope or duration of work or to estimate the contract costs with any degree of confidence and that no other type of contract would be suitable (app. supp. R4, tab 18 at PMCS666). The administrative record does not contain a determination by the contracting officer that a labor hour contact would be appropriate for the SOP manual CLIN.[10]

Additionally, we note that the parties' performance of the contract treated it as a fixed-price contract. The PMCS purchase orders sought payment for a set percentage of the fixed-price amount and did not contain any documentation of or support for the labor hours performed (app. supp. R4, tabs 33-36, 39-40). The invoices for the DBE manual simply list a quantity of "1" for consulting services in the amount of $66,015.16 (or a similar amount) based on the invoicing schedule contained in PMCS' cost proposal and dividing the $396,090.96 line item cost estimate into six equal payments of $66,015.16 (61861 R4, tab 1 at WMATA-083; app. supp. R4, tabs 33-36, 39-40). By contrast, the vouchers that included work for CLIN 2-1, the certification and compliance task, included variable quantities of labor hours that were invoiced at the set labor hour rates (app. supp. R4, tabs 37, 41-42). Thus, we find that the parties treated the DBE SOP manual CLIN as a firm-fixed-price CLIN, and we accord the parties' contemporaneous interpretation of the contractual terms during performance of the contract, and prior to the contractual dispute, great if not controlling weight in interpreting the contract.[11] *See, e.g., Reliable Contracting Grp., LLC v. Dep't of Veterans Affairs*, 779 F.3d 1329, 1332 (Fed. Cir. 2015).

Having determined that CLIN 1-1 for the DBE SOP manual is firm-fixed-priced, we find that FAR 52.212-4 CONTRACT TERMS AND CONDITIONS–

---

[10] The administrative record does not contain a determination for the flexibly-priced certification and compliance line item either.

[11] This is especially true here, where there is a contract created by performance rather than a bilateral contract.

COMMERCIAL ITEMS (MAR 2009) (ALTERNATE I – OCT 2008) (DEVIATION 1 – FEB 2007), the provision from the GSA IT Schedule 70 conflicts with the WMATA inspection and acceptance provisions, and that it is not possible to read the provisions to give effect to both clauses.

In interpreting the WMATA purchase order, we apply the rule of interpretation that "[w]here specific and general terms in a contract are in conflict, *those which relate to a particular matter control over the more general language*." *Abraham v. Rockwell Int'l Corp.* 326 F.3d 1242, 1254 (Fed. Cir. 2003) (emphasis in original) (quoting *Hills Materials Co. v. Rice*, 982 F.2d 514, 517 (Fed.Cir.1992)). Here, the CLIN providing that the purchase order is written consistent with PMCS' GSA schedule contract is a specific provision, while the incorporation by reference of WMATA's general terms and conditions is a general provision. Accordingly, we find that the controlling contractual provision for inspection and acceptance is FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAR 2009) (ALTERNATE I – OCT 2008) (DEVIATION 1 – FEB 2007). Note that we reach this result by interpreting the WMATA purchase order, and not by interpreting the GSA schedule.[12] Pursuant to the acceptance provision in FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (MAR 2009) (ALTERNATE I – OCT 2008) (DEVIATION 1 – FEB 2007), acceptance is presumed to have occurred within 60 days, unless accepted earlier. FAR 52.212-4(a)(3) (Deviation 1 – FEB 2007).

WMATA contends that this SOP manual was a labor hour CLIN, and cites to the inspection provision at FAR 52-212-4 for a six month time period after acceptance for WMATA to notify the contractor of failure to meet the contractual requirements (WMATA br. at 9). However, we found above, that this was a fixed-price contract. The FAR deviation applicable to fixed-price contracts provides that within six months "the ordering activity may require the Contractor to replace or correct services or materials that at time of delivery failed to meet contract requirements." FAR 52.212-4(a)(4) (Deviation 1 – FEB 2007). Unlike the general FAR clause, the FAR deviation clause contained in PMCS' GSA schedule does not contain the provision providing that "the Government may seek an equitable price reduction or adequate consideration for acceptance of nonconforming supplies or services." FAR 52.212-4(a). Thus, pursuant to the contract, WMATA had a contractual right to require PMCS to correct its work, but lacked a right to equitably reduce

---

[12] Although we interpret the conformed contact such that we give effect to the GSA Schedule terms and conditions, the WMATA purchase order is the document that provides us with jurisdiction to entertain these appeals, and we look to the WMATA disputes clause in interpreting our jurisdiction.

22

the contract amount.[13]  WMATA did not offer PMCS an opportunity to fix its work (tr. 1/110).

In its complaint and post-hearing brief, PMCS asserts entitlement to Prompt Payment Act interest, and also asserts in its complaint entitlement to attorney fees and costs pursuant to the Equal Access to Justice Act (EAJA), 5 U.S.C. § 504 (compl. at 2; app. br. at 13).  WMATA did not address these issues in its post-hearing briefing. However, we note that the Prompt Payment Act applies to federal agencies, and WMATA is not a federal agency.  5 C.F.R. Part 1315.  Moreover, our precedent makes clear that WMATA has not waived immunity regarding pre-judgment interest.  *Delta Eng'g, Inc.*, ASBCA No. 58063, 14-1 BCA ¶ 35,553 at 174,224; *see also Kingston Constructors, Inc. v. WMATA*, 860 F. Supp. 886, 888 (D.D.C. 1994).  To the extent that PMCS is requesting a determination that it is a prevailing party in the litigation as part of an application for attorney fees and costs pursuant to EAJA, we find that such a request is premature.[14]  *See Shiloh*, 18-1 BCA ¶ 37,117 at 180,662.

Thus, for the reasons stated above, appeal ASBCA No. 61861 is sustained in the amount of $66,015.16.

III. *The Appeal of WMATA's Claim* (*ASBCA No. 62173*)

WMATA contends that it is entitled to a refund of the amounts advanced to PMCS for the SOP manual based on the inspection of services clause discussed above with regard to PMCS' appeal.  WMATA contends that PMCS was obligated to provide the deliverables specified in its technical proposal, and that PMCS is not entitled to payment for work product that did not fulfil the contract requirements (WMATA br. at 4-6, 8). WMATA specifically relies upon PMCS' amended cost proposal, stating that PMCS will perform "the work outlined in the Technical Proposal to support the DBE program" (WMATA br. at 4-5; 62173 R4, tab 2 at WMATA-279).

PMCS contends that it performed the requirements of the contract, as amended at the kick-off meeting and based on the hearing testimony of Mr. Franklin.  PMCS additionally contends that SOP manual was a firm-fixed-price CLIN, and thus, that the payments were progress payments and not advance payments subject to recovery by WMATA (app. reply at 2-4).

---

[13] If WMATA had notified PMCS of deficient work, and PMCS had failed to correct the work, WMATA would have had the right to perform or reprocure the work and deduct the costs from the contract amount.  FAR 52.212-4(a)(5) (Deviation I).

[14] Given that WMATA possesses sovereign immunity, it may also be immune to suit for attorney fees.

Having determined that WMATA accepted PMCS' submission 60 days after delivery pursuant to contract clause FAR 52.212-4(a)(3) (Deviation I), we must deny WMATA's appeal, as its only remedy pursuant to that clause, absent fraud, lack of good faith, or willful misconduct not alleged in these appeals, was to require PMCS to replace or correct its work. As an alternate basis for our holding, we find that, even if WMATA had not accepted PMCS' work by failing to reject it within 60 days, WMATA failed to establish that PMCS did not perform the contractually-required tasks.

We again construe the WMATA purchase order as a counter-offer to PMCS' proposal, and hold that PMCS accepted the counter-offer by performance. Accordingly, we find that the scope of work contained in the conformed contract (61861 R4, tab 1 at WMATA-027-33) specifies the deliverables required under the contract, rather than the list of deliverables contained in PMCS' technical proposal. We find this to be the case despite the fact that Mr. Franklin testified that he had never seen the scope of work before (tr. 1/33), and that PMCS contends that there was not a statement of work in the conformed contract (app. reply at 2 n.1).

The WMATA statement of work provides:

I.      DELIVERABLES

1.1 Basis of Acceptance of Deliverables

The engagement deliverables will be discussed at the start of the engagement and will likely include, but is not limit [sic] to:

• Participation in meetings and discussions of DBE goals;
• On-site visits to process DBE applications;
• Contract compliance;
• On-site visits to work site to ensure DBE compliance;
• Periodic reporting and updates to DBE management;
• Completed forms and reports as required by the program; and
• Complete evaluations and assessments with appropriate opinions and conclusions.

(61861 R4, tab 1 at WMATA-028) In addition, the statement of work lists a number of standard deliverables such as timesheets, cumulative performance reports and status reports (*id.* at WMATA-028-29). Mr. Franklin testified that this list of deliverables was generally consistent with his understanding of the required deliverables for the project (tr. 1/34). Notably, the scope of work provides that "deliverables will be discussed at the start of the engagement" (61861 R4, tab 1 at WMATA-028). This is consistent with Mr. Franklin's testimony that the deliverables were discussed at the kickoff meeting, and

24

that Mr. Jones instructed PMCS to perform tasks 1, 2, 3, and 5 of PMCS' proposal, but that Mr. Jones was not interested in focusing on task 4 (Process and Performance Metric Identification) (tr. 1/50-51), and that he was later instructed to combine the training manual and SOP manual into a single document (tr. 1/165). WMATA did not present any testimony from the WMATA participants at the kickoff meeting. WMATA disputes Mr. Franklin's testimony as unsupported by documentary evidence (WMATA br. at 9). However, WMATA's statement of work provides that the deliverables will be "discussed" at the start of the engagement, and does not provide that the deliverables will be reduced to a writing. Thus, we accept Mr. Franklin's unrebutted testimony regarding the parties' agreement as to deliverables.

Having defined the requirements of the contract, we turn to WMATA's assertion that PMCS did not provide the deliverables required by the contract. WMATA asserts that PMCS was required to provide the deliverables identified in its technical proposal, based upon a statement in the September 12, 2017 cost proposal (WMATA br. at 4-5). However, the September 12, 2017 revised cost proposal is not part of the conformed contract, and thus is parol evidence that may be used to interpret an ambiguous contract, but cannot supply inconsistent contemporaneous and prior contract terms. *See, e.g., Sylvania Elec. Prods, Inc. v. United States*, 458 F.2d 994, 1005 (Ct. Cl. 1972). Moreover, the revised cost proposal is dated before the date of the contract, so the statement WMATA is relying on is a prior term that was not incorporated into the final contract.

WMATA relies on Mr. Franklin's testimony that the contact amount in the purchase order was for delivery of everything in the technical proposal; however, he also testified that PMCS had, in fact, delivered everything specified (tr. 1/148-49, 156-57). The focus of WMATA's argument regarding non-delivery of project tasks is for items such as the project charter, a deliverable that Mr. Franklin testified was prepared, but that he could not identify in the record (tr. 1/158). However, the project charter was not specified as a deliverable under the WMATA scope of work (61861 R4, tab 1 at WMATA-028-29). The same is true for the business process diagram and workflow recommendations (tr. 1/162), process metrics reports (tr. 1/164), and performance metrics (tr. 1/165). WMATA also focuses on the non-delivery of task 5, the training manual that Mr. Franklin testifies was combined with the SOP manual at the direction of WMATA (tr. 1/165). However, the training manual is not specified as a deliverable on the WMATA scope of work (61861 R4, tab 1 at WMATA-028-29).

An additional problem with WMATA's claim is that WMATA attempts to demonstrate the deficiencies in PMCS' performance by comparing the SOP manual to the applicable federal regulations, rather than to the requirements of the contract. While WMATA clearly demonstrated that it did not get what it wanted from PMCS in the SOP manual, it did not demonstrate by a preponderance of the evidence that it did not receive what it contracted for. WMATA presented hearing testimony from Ms. Anderson, the contracting officer, and Ms. Edwards, WMATA's COTR and DBE expert, in support of

25

its claim. At the hearing, Ms. Anderson was generally unable to identify the deliverables that PMCS had or had not provided (tr. 1/270-98). Ms. Anderson additionally testified that she based her decision upon PMCS' technical proposal, rather than the "unrelated" WMATA scope of work (tr. 1/299-300). Ms. Anderson further testified that she based her decision upon information provided by Ms. Edwards, and others in the DBE office (tr. 1/300-01). However, Ms. Edwards testified that she had never reviewed the scope of work for the contract or PMCS' technical proposal (tr. 1/230-31). Ms. Edwards instead based her assessment on her discussions with PMCS and the provisions of 49 C.F.R. Part 26, because the DBE program must follow the federal regulations (tr. 1/233). Thus, independent of our finding that WMATA's claim for return of contract funds must be denied because WMATA did not reject PMCS' deliverables within 60 days of delivery, we hold, alternatively, that WMATA failed to demonstrate, by a preponderance of the evidence, that PMCS failed to supply contractually required deliverables, or that the deliverables were deficient.

Additionally, to the extent WMATA alleges that it can withhold payment of PMCS' invoice due to PMCS' late provision of the SOP manual deliverable (62173 R4, tab 1 at WMATA-273; WMATA br. at 7), we reject that justification as a basis for WMATA's affirmative claim for return of contract payments. Assuming, without holding, that PMCS' deadline for delivery of the SOP manual was March 14, 2018, and not September 17, 2018 as specified in the WMATA purchase order (ex. A-1), or June 2018, as specified in the WMATA scope of work (61861 R4, tab 1 at WMATA-031), and was not extended by Ms. Anderson to March 19, 2018 (app. supp. R4, tab 11 at PMCS536; tr. 1/100), we find that the conformed contract did not permit WMATA to seek return of contract funds on that basis. The WMATA purchase order incorporates the WMATA standard terms and conditions,[15] which provide that a contractor is in default if it breaches a material obligation of the contract (61861 R4, tab 8 at WMATA-265). In the event of a material breach, the contracting officer can send a notice of breach to the contractor, stating that the contractor has 10 days, or such additional time specified by the contracting officer to cure the breach (*id.*). However, WMATA did not terminate the contract for default and simply seeks to apply the remedy for breach without actually terminating the contract for breach. For these reasons, ASBCA No. 62173 is sustained, and WMATA's affirmative claim for return of contract funds is denied.

---

[15] Here, the GSA schedule does not contain a conflicting provision, so we apply the WMATA terms and conditions.

CONCLUSION

For the reasons stated above, ASBCA Nos. 61861 and 62173 are sustained. Judgment is entered in favor of PMCS in the amount of $66,015.16.

Dated:  June 25, 2020

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61861, 62173, Appeals of Professional Management Consulting Services, LLC, rendered in conformance with the Board's Charter.

Dated:  June 26, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals